[No. 1904.]

## Morg. McInturf v. The State.

| 20 | 335 |
| 29 | 201 |
| 20 | 335 |
| 30 | 655 |
| 31 | 152 |
| 20 | 335 |
| 36 | 574 |
| 37 | 869 |
| 38 | 657 |

1. Murder — Alternative Penalty. — The Constitution of 1869 authorized juries in capital cases to substitute imprisonment with hard labor for life in lieu of the death penalty. The Constitution of 1876 contains no similar provision, and no other legislation was had with respect to punishment for murder until the adoption of the Revised Codes in July, 1879, when the same alternative punishment was provided for murder of the first degree. It is insisted in this case that the Constitution of 1876 wholly superseded the previous Constitution of 1869, and left in force none of its provisions except such as were expressly continued in operation, and that, inasmuch as the Constitution of 1876 is silent as to punishment for murder, there was no punishment for murder of the first degree prescribed by the laws of this State, from the adoption of the Constitution of 1876 until the adoption of the Revised Codes. *Held*, that this doctrine cannot be maintained. On the contrary, section 8 of article V of the Constitution of 1869, which provides "That in all cases where by law it may be provided that capital punishment may be inflicted, the jury shall have the right, in their discretion, to substitute imprisonment for life," instead of repealing or abrogating former laws, recognizes their force, existence and binding effect, but gives to the jury the right to ameliorate or commute the punishment in capital cases. The effect of the Constitution of 1876 was simply to repeal this commutation or alternative punishment clause, and to leave in force and effect the penalty as it existed prior to the Constitution of 1869, and that penalty (death) again become the only penalty for murder in the first degree until the alternative clause was restored by the adoption of the Revised Codes in 1879. See the opinion on the question.

2. Same. — Ex Post Facto Laws are not such as modify the rigors of the criminal law, but those only that create or aggravate the crime or increase the punishment, or change the rules of evidence for the purpose of conviction. A mere remedy which ameliorates punishment and inures solely to the benefit of the party to be punished can in no sense be regarded as a retroactive or *ex post facto* law, and especially when it is within the option of the offender to elect the original penalty, as is provided by the Penal Code of this State.

3. Same — Election of Penalty. — Article 15 of the Penal Code provides as follows: "When the penalty for an offense is prescribed by one law and altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offense was committed, and if convicted, punished under that law; except that, when by the provisions of the second law the punishment of the offense is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offense was committed." This right of election obtains only in cases in which the penalty, by subsequent enactment, is ameliorated, and is available to the accused only before verdict. Failure of the accused to elect devolves upon the trial judge the duty of awarding him the benefit of the ameliorated punishment.

4. MURDER — VERDICT — CLERICAL OMISSIONS. — The verdict as copied in the judgment of the court finds the defendant guilty of murder in the first degree and assesses his punishment at confinement in the penitentiary — omitting the life term. Such a verdict would be fatally insufficient but for the fact that the record elsewhere shows the omission to be a mere clerical error, and that the verdict as rendered was in statutory form, and assessed the imprisonment in the penitentiary for life; which is sufficient. But note the animadversion of this court upon the perpetration of such mistakes.

5. PRACTICE — PRIVATE PROSECUTOR — JURY LAW — CASE APPROVED. — Subscribers to a fund for the employment of counsel to prosecute, or to aid in the prosecution of, an accused, are not private prosecutors within the meaning of the statute; and the refusal of the trial court to compel a disclosure of the list of the subscribers is not error, when a full examination of the particular jurors has been made with regard to their connection with the fund subscribed. See the opinion in illustration, and note the approval of the doctrine on the subject as announced in *Heacock* v. *The State*, 13 Texas Ct. App., 97.

6. SAME — EVIDENCE. — It is not competent in a murder trial to inquire into the probability of the guilt of any person other than the accused unless the inculpatory facts are such as are proximately connected with the transaction. It is urged in this case that the trial court erred in rejecting evidence for the defense in regard to murders alleged to have been committed by the deceased in 1862 and 1864. It was not proposed by the defense to show that any one likely to avenge the alleged murdered parties was in proximity to the place of the homicide at or about the time it was committed, or had any opportunity to kill the deceased. Under the circumstances, the ruling of the trial court was correct.

7. SAME. — It was in proof that, just after he was shot, the deceased staggered into his house and requested his wife to examine his wound. When she told him that the ball had passed entirely through his body, he remarked: "I am a dead man; but, thank God, I die innocent." In reply to his wife's inquiry as to who shot him, the deceased said: "Morg. McInturf (defendant) and them." *Held*, that the evidence was clearly *res gestæ*, and was properly admitted.

8. PRACTICE — PRIVILEGE OF COUNSEL. — Prosecuting counsel have the right to deduce from the facts legitimately in evidence, a motive on the part of the accused to commit the crime for which he is on trial, and to urge it upon the jury. See the opinion *in extenso* for circumstances under which it is held that the prosecuting counsel in this case did not commit such an abuse of the privilege of argument as to warrant a reversal.

9. SAME — NEW TRIAL. — See the opinion for evidence adduced in support of a motion for new trial *held* insufficient to authorize the award of a new trial.

10. MURDER — FACT CASE. — See the statement of the case for evidence *held* sufficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Erath. Tried below before the Hon. T. L. Nugent.

The indictment in this case charged the appellant with the murder of R. R. Hamilton, in Erath county, Texas, on the 18th day of

December, 1878. He was brought to trial at the April term, 1885, of the district court of Erath county, and was found guilty of murder of the first degree, and was awarded a life term in the penitentiary as punishment.

The first witness for the State was James D. Hamilton, the son of the deceased. He identified the defendant on trial as Morg. McInturf, whom he had known for eight or ten years. The deceased was killed at his home on Sandy creek in Erath county, on the night of December 18, 1878. During the spring of 1878, the deceased lived on the E. Thompson place, about two miles distant from the place on which he was killed. It was during that spring, and at the Thompson place, that the witness first saw the defendant. He came to that house riding a small grey pony and remained over night. He visited the deceased's house, after the latter removed from the Thompson place, several times during the summer of 1878, and once during the fall, before the killing, and on each of those occasions he rode a small, one-eyed brown pony. He spent the whole of one day and night, on one of the summer visits. On the visit last mentioned the defendant brought with him a saddle blanket which had red and blue stripes across the ends. From this blanket, extending across its middle, the witness picked a strand of threads in order to make the blanket retain its fold or double. The witness's uncle, Buck Payne, had a blanket similar in every respect, except the color of the stripes across the ends, from which the witness had previously extracted threads in the same manner. At the time of his death the deceased had posted a mare which the defendant claimed.

The witness's father was killed at about good dusk on the evening of December 18, 1878. Those present at the time were the witness, his mother, his sister Alice and two younger sisters. Just before the killing the witness heard some one whistling on the road, which, in a roundabout way, led from the deceased's house to Thompson's place. That road made a turn near the deceased's house, and a person at that point of the road would not be in the direction of Thompson's house. The deceased at that time was sitting in front of his fire, and was taking off his shoes. He had removed one shoe, when some one called at the gate. Deceased replied: "Halloo, sir!" and went to and stood in the door. Witness followed and stood in the door. The man then asked deceased: "Was that man Payne's corn sold to-day?" Deceased replied in the affirmative, and the man asked if deceased knew where he could buy as much as thirty or forty bushels. Deceased replied that

old man Chambliss would sell him that much, or more if he wanted it. The deceased then stepped out from the door, followed by his daughter Alice, went to a point within a few steps of the man and asked if he would not dismount and remain over night. The man replied that he would not, but must go on. He then remarked that he was a new comer in the neighborhood, and had been engaged picking cotton for Mr. Bass. He then asked deceased where a man named Thomas or Thompson lived. Deceased pointed in the direction of Thompson's house with his right hand, and while thus directing the man how to go Thompson's, the man pulled a pistol from his breast with his right hand, fired upon and shot deceased through the breast, said: "Good day, sir!" and rode away. That man was the defendant. Every word spoken by the defendant prior to the killing was spoken in an assumed or disguised voice, and witness did not recognize it. He, however, recognized the horse as the one-eyed brown horse, and the overcoat worn by the man as the blue Yankee overcoat worn by the defendant on his last visit to the deceased's house. The moon was shining. The words: "Good day, sir!" spoken just after the shooting, were spoken in the defendant's natural voice, and the witness recognized it instantly. He also recognized the defendant's face by the flash of the pistol. The witness was absolutely positive that the man who fired the shot that killed the deceased was the defendant and no other. He recognized the horse and the Yankee overcoat, by the moonlight, and before the shot was fired, and the face by the flash of the pistol, and fully recognized the defendant's voice in the words: "Good day, sir!" The witness stood in the door, and on the door step, from the time that the deceased went to the door until the moment he was shot.

When the ball took effect, the deceased exclaimed: "Don't shoot me any more, Morg.; I am a dead man." He then staggered back towards the house and was caught by the witness's mother, who, with the witness's aid, helped him into the house. Some one closed the door. Deceased tip-toed and placed his mouth to an opening in the door and exclaimed: "Whoo-e-e!" three times. Witness's mother eased him to the floor and asked him who shot him. He replied: "Morg. McInturf and them." Witness then went after Mr. Chambliss, and when he returned, ten minutes later, his father was dead. He lived about fifteen minutes after he was shot. On the next morning, early, witness went for Mr. Hilliard Yarbrough and Mr. E. Thompson, both of whom lived on the Granbury and Eastland City road. Deceased's house was not on a public road. A

person going from Eastland City to deceased's house would pass first Mr. Cresswell's house, then Mr. Yarbrough's, and then Thompson's, near which he would leave the Eastland City and Granbury road, turning to the left and a little back. *En route* to Thompson's, on the morning after the homicide, witness saw the tracks of a pony which he took to be the tracks of the animal ridden by the defendant to the place of killing on the night before. Those tracks, leaving deceased's house, turned to the right about a half mile from the house, in a trail which led to Mr. Yarbrough's field and the Granbury and Eastland City road. Before reaching the point where the tracks reached the trail mentioned, the witness found a saddle blanket which resembled the blanket the defendant had at the deceased's house in the summer. The stripes at the ends were of the right color, and the threads were picked out of the center. That blanket, the witness thought, was the defendant's blanket, and witness kept it for two years, when the cattle got it and chewed it up. At the other end of the trail, at the point near Yarbrough's where it entered the Granbury and Eastland road, witness found the tracks of the pony going into the road. Witness followed those tracks to Yarbrough's house. He saw that the same track passed Yarbrough's and Thompson's houses and led direct to deceased's house, and to the very point where the brown pony stood when the fatal shot was fired. The tracks were medium in size and were of a shod animal.

Cross-examined, the witness stated that the moon was not shining when he first went to the door, but rose above the trees while he was standing in the door, and while the deceased and the defendant were talking. The stars were shining also, and altogether it was quite a bright night. The conversation between the deceased and the defendant which preceded the shooting lasted about five minutes. At the time that the fatal shot was fired the witness's mother was sweeping the floor; his sister Alice was standing at the deceased's elbow, and the witness a little back and to one side of deceased, facing defendant. When the defendant visited deceased's house in the spring before the shooting, he was accompanied by the witness's uncle, Buck Payne. He rode a grey horse with a yellow Texas saddle, and wore a blue Yankee overcoat, black sack coat, boots and a white hat. Witness did not know his age. He came one afternoon and left on the next afternoon. Witness picked the threads from his saddle blanket to make it fold, just as he had previously picked the threads from his uncle's blanket. The two blankets differed only in the color of the end stripes. The defendant came to deceased's house twice again in July and once in the fall, but on

each occasion was alone. He wore blue clothes in the summer, and rode the one-eyed, brown horse, with the same blanket witness had picked. He stayed all night at the deceased's house once after the fall visit. Deceased was then in Stephenville, and witness's mother and sisters spent the night at the house of Mr. Chambliss. Defendant, witness and Mr. Chambliss's boy stayed at the deceased's house on that night. The next time defendant came to the house he killed the deceased. Witness was twenty-one years of age.

Buck Payne lived at the deceased's house in 1878, but not at the time of the killing. He was not at the house on that night. Witness saw him about a week before the killing, and not again until about twelve months afterwards. The stripes on Buck's blanket were blue and white, and those on defendant's blanket were red and blue. Deceased, on the day of the killing, bought Buck Payne's corn in the field. Witness had not recognized the defendant's face and voice up to the time of the shooting, but recognized the face when the shot was fired and the voice when the words "Good day, sir," were spoken. He had previously recognized the defendant's horse, blue Yankee overcoat, and black hat, which had a yellow leather band and a white buckle. Witness did not, of his knowledge, know where Buck Payne was on the night of the killing. He was not at the inquest over the body of the deceased or at the funeral. The fatal bullet passed into the body of the deceased just under the right nipple. Deceased had but one shoe on when he went out of the house and invited the defendant to dismount and stay all night. Defendant drew his pistol from his breast with his right hand, laid it across his left, with which he held his bridle reins, and fired.

Witness testified before the inquest over the body of his father, and the statement handed him is the statement he made on that occasion, except that he did not, as it appears in the writing, say on that occasion that he *thought* the defendant killed the deceased. On the contrary, he said then as now, that the defendant did kill the deceased. Witness could not undertake to explain how the statement as it appears was written down. He did not now know any better than he did then that the defendant killed the deceased, nor that the blanket he found was the defendant's blanket. The stripes were the only difference between the blankets of Buck Payne and defendant after the threads were picked from both. "Defendant's blanket had red and blue stripes, and Payne's had green and yellow stripes; —— no, the stripes in defendant's blanket were red and green, and in Payne's they were green and yellow." Witness was as certain about the colors of the stripes as he was about any

fact he had testified to. Witness knew Press Abbott, with whom he lived for two or three weeks in 1879. Witness did not tell Abbott that Buck Payne and another man killed his father. He did not tell him that Buck was in the penitentiary, and the other, he hoped, in hell. The witness knew no Morg. McIntosh. When he testified on the inquest that Morg. McIntosh killed deceased, he referred to the defendant, Morg. McInturf. Buck Payne was taller and larger than defendant, and did not resemble defendant.

· Alice Hamilton was the next witness for the State. She testified that she was the daughter of the deceased, and was present when he was shot, on the night of December 18, 1878. The witness had known the defendant about twelve months at the time he killed the deceased. He came to the deceased's house the first time about noon, stayed all day and night, and left next morning. He came to the house a second time about a month later, and again two or three months later, and the last time before the killing not less than three nor more than five days before the killing. He spent the night at the house with witness's brother James and Mr. Chambliss's little boy. Witness, her mother and sisters, spent that night at Chambliss's house. Defendant took breakfast next morning at Chambliss's house. The witness, her mother, her brother James and her two little sisters were at home on the night of the killing. Witness, a short time before the homicide, heard her dogs barking. Some one said: "Begone!" and then called: "Halloo!" Deceased responded: "Halloo!" and went to the door, barefoot, having just removed his shoes. The man said: "I suppose this is Mr. Hamilton's?" He then asked deceased where he could buy thirty or forty bushels of corn. Deceased replied that he could get all he wanted from Mr. Chambliss, and walked out to where the man was. Witness followed and stood by her father's side. Deceased asked the man to get down. He declined, saying that he must go on. He then asked directions to Mr. Thompson's. He, the man, was then sitting on his horse about fifteen feet from the door, with his hand under his coat. Deceased was near him, and witness was not exceeding five feet distant from him. While the deceased, with his arm extended, was pointing out the road to the man, witness saw the latter drawing his pistol, and called to deceased: "O Pa! Morg. is going to shoot you!" At that instant the man, who was none other than the defendant, fired, said "good evening," or "good day, sir," and rode off. Witness's mother and her brother James helped the deceased into the house, when he said "who-e-e" three times, and then: "I am a dead man, but, thank God, I die innocent." He

then said to witness's mother: "Morg. has killed me." Witness recognized the horse as the brown horse which the defendant had ridden to deceased's house on two former occasions. ' She recognized the defendant by his face and voice. He wore a Yankee blue overcoat just like the one he had on at the houses of deceased and Chambliss three or five days before. He had on a white hat and a white nubia, or other such garment, about his neck. Witness's brother James went to Yarbrough's on the next day, and brought back a saddle blanket which the witness had several times seen in the possession of the defendant. Some threads had been drawn from across the middle of that blanket by witness's brother James in witness's presence. The blanket had red and yellow stripes across the ends.

Cross-examined, the witness stated that at the time of the defendant's first call, about a year before the homicide, deceased lived on the Thompson place. His second visit was paid at the same place about a month later. His third visit was made after the deceased had moved into the house where he met his death. The last visit made by defendant to the deceased's house was either three or five days before the killing. He then wore a blue Yankee overcoat and a white hat. On several of his previous visits the defendant rode the same little brown horse that he rode the night of the killing. Witness knew the horse. She saw the defendant saddle him when he left deceased's house the last visit he made before the killing. Witness did not know whether or not the brown horse was shod, or whether he had a defective or a blind eye. Witness did not see her brother James when he followed her and her father to the door, but saw him in the door while the conversation between the defendant and the deceased was going on. That conversation lasted about fifteen minutes. Witness saw the defendant's face distinctly when he fired, and recognized it. She knew and recognized the defendant by his voice before the shooting,—knew him from the time the conversation began,— and got a perfect sight of his face when the pistol fired. She knew him by his face, voice and dress. It was a somewhat cloudy night, but the moon shone brightly through the clouds at times. It was between the drawing and the firing of the pistol that witness called to her father, "O! Pa, Morg. is going to shoot you!" Defendant's blanket had one red and two yellow stripes. Buck Payne's blanket was a lighter gray in color than defendant's, and had black and white stripes. Witness had never observed that threads had been pulled from Payne's blanket. Witness knew the blanket brought home by her brother James to be

the defendant's blanket, because she saw the threads drawn from it by James during the preceding July.  Buck Payne was at the deceased's house about half an hour by sun on the evening before the killing.  Witness did not see him again until the next summer.  He was not at the inquest nor at the funeral.

Mrs. E. Adams testified, for the State, that she was the wife of the deceased at the time of his death.  Witness first saw the defendant, as well as she with her poor memory could recollect, at her house on the Thompson place, about two months before the killing. Witness, deceased, and their children, including the witnesses James and Alice Hamilton, were at home on the night of the murder. Someone called "Halloo" at the gate.  Deceased went out, and witness soon heard him invite the person to get down.  The witness shortly heard the report of a pistol, followed by the exclamation by Alice: "Morg. has killed Pa!"  Deceased was taken into the house, when he placed his mouth to the top of the door and said: "Who–e–e" three times, after which he lived but a few minutes.  Soon after he got into the house he asked witness to see if the ball went through him.  Witness placed her hand to his back and caught a flow of blood.  She told him that the ball had passed entirely through his body.  He replied: "I am a dead man, but I die innocent!"  Witness asked him who shot him, and he replied: "Morg. McInturf and them."  On the next morning witness's son James brought a blanket to the house just like a blanket witness had seen in the possession of the defendant.

Cross-examined, the witness stated that she married the deceased in 1862 in Denton county, Texas.  She had known him three years at the time of their marriage.  He was thirty-six years old when he was killed.  When deceased and witness were married, the former was a Confederate soldier.  He was not a member of Bolling's regiment, or Jim Hamilton's company.  The witness and deceased went from Denton to Hays county; from Hays to Grayson; then to Montague; then to Austin; then to McLennan; then to Bosque, and from Bosque in 1877 to Erath county, settling on Sandy creek, first in the valley, then on the mountain (Thompson's place), and finally went back to the valley where the killing occurred.  On his first visit the defendant rode a grey horse.  Witness did not see the horse he rode on the visit he paid the house but a few days before the killing.  The conversation between the defendant and the deceased, at the time of the killing, was a short one.  The night was cloudy but light at times.  Buck Payne was at the deceased's house about two hours before sundown on the evening of the killing, and quite

a time elapsed before the witness next saw him. Deceased said that "Morg. McInturf and them" killed him. Witness did not think she used the name McIntosh before the coroner, but, if she did, she meant McInturf. A short time previous to the killing the deceased attended court at Stephenville, and on his return said that he was afraid Morg. McInturf would kill him. Witness did not herself write her statement before the coroner's jury.

W. L. Yarbrough testified, for the State, that he saw the defendant at the house of his father, Hilliard Yarbrough, in July or August, 1878, on which occasion defendant dined at that house. Witness heard of the killing of deceased on the next morning after it occurred. On the evening before the killing the witness saw a man pass the house, traveling east on the Granbury and Eastland road. He rode a brown pony, and wore a dark overcoat.

Drury Bass testified, for the State, that he lived in Erath county in 1878. He and his wife were at R. L. Cresswell's house four or five days before the assassination of Hamilton. A man who had a noticeably small hand and foot,— such as the defendant's,— came to Cresswell's house on that day and got dinner and some corn for his horse. When witness first saw the defendant in court he took him to be that man. When witness picked out the defendant in the court-room as the same man he saw at Cresswell's, he did not know that he was the defendant in this case.

R. L. Cresswell testified, for the State, that in 1878 he lived in Erath county, Texas, on the Granbury and Eastland City road. Witness was at home on the evening of the assassination, and heard of it next morning. Witness's wife, Mrs. Bass and Mrs. Hilliard Yarbrough were at witness's house on the evening of the killing. When the witness got home about 5 o'clock in the evening, he found a rather small-sized man sitting at the fire. He had on a Yankee blue overcoat. He left shortly after the witness entered, first asking witness where he could buy some corn. Witness told him that Buck Payne had corn for sale. He left witness's house, going east towards Thompson's, riding a dark brown horse.

Mrs. R. L. Cresswell, the wife of the previous witness, testified for the State that her aunt, Mrs. Bass, and her husband were staying at her house in December, 1878. A few days before the assassination of Hamilton, a stranger stopped at witness's house for dinner, which Mrs. Bass got for him, the witness being sick in bed. Mrs. Hilliard Yarbrough was at the house at the time. Witness did not know the man at that time. Late in the afternoon of December 18, 1878, a man whom the witness took to be the same man who previously

stopped there for dinner, came to the house, to warm. He sat down to the fire with his hat on. He had on a Yankee overcoat, and the witness saw the form of a pistol under the coat. Mrs. Bass and Mrs. Yarbrough were there on that occasion. The man made inquiries about corn. The witness saw a man in the court-house on the morning of this trial whom she took to be the same man.

Mrs. Drury Bass, for the State, testified substantially as did Mrs. Cresswell, and in addition that the man who called at Mrs. Cress-well's on the two occasions spoken of was the defendant, and no other. On his last visit, the very evening of the killing, he asked a great many questions about the deceased and Buck Payne,— whether they were at home and what they were doing. He made no inquiries when there the first time.

Mrs. Hilliard Yarbrough testified substantially as did Mrs. Bass and Mrs. Cresswell, and, in addition, that the same man took dinner at her house during the previous summer. Witness's husband told her that that man's name was McInturf.

Hilliard Yarbrough testified, for the State, that the defendant was the same man who took dinner at his house in the summer of 1878, as testified by witness's wife. Witness asked him his name because he asked about Hamilton and Payne, whom he said he knew.

E. Thompson testified, for the State, that about sundown on the day of the assassination, a man riding a dark brown pony and wearing a Yankee blue overcoat, and a fabric of some kind under his chin, stopped at his house, and asked about corn for sale. He talked like a man with a severe cold. He asked if Buck Payne had corn for sale, and got directions to the house of the deceased, towards which house he went when he left. He was a medium sized man. Cross-examined, the witness said that his house was a mile and a half or two miles off the direct route from Cresswell's house to the deceased's house. Witness and Buck Payne had a conversation a few days prior to the assassination, in the presence of a tall, black-bearded man who was a stranger to the witness. Payne said that the deceased had procured an indictment against him and McInturf, and that he, Payne, had a good notion to go to deceased's house with a gun and kill him. Witness had never seen the tall, black-bearded stranger since.

W. E. Ringer testified, for the State, that in 1878 he lived in Eastland county, Texas. Witness lost a mare and colt about three months before the assassination of Hamilton. Witness recovered his animals from the deceased, and sent his, Hamilton's, name to District Attorney Buck as a witness against the defendant.

The State next introduced in evidence an indictment, filed in December, 1878, charging the defendant with the theft of a mare, the property of W. E. Ringer, on the back of which the deceased's name was indorsed as a witness for the State. The State closed.

Henry Fooshee testified, for the defendant, that the minute book of the district court of Erath county, Texas, shows that, at the fall term, 1878, of said court, an indictment was presented charging Buck Payne with the theft of W. E. Ringer's mare. The prosecution was dismissed by the State. The deceased was a State's witness in that case. The indictment had been lost.

Lee Young testified, for the defense, that he was retained as counsel by Buck Payne in the case against him for the theft of Ringer's mare; which case was dismissed.

John Friend testified, for the defense, that he and the defendant were half-brothers. Defendant was born and raised in Denton county, Texas. Witness knew the deceased in Denton county before the Confederate war. He also knew his father, James Hamilton, and his, deceased's, wife, in Denton county. Deceased was a member of Patton's company of Bolling's regiment, in which regiment his father was a third lieutentant. Bolling's regiment was stationed at Gainesville, Texas. Witness knew one Tolls in Denton county, and one Maxwell and one Fishback in Jack county. Tolls, Maxwell and Fishback were killed during the war, about a mile and a half from the public square of Sherman, Grayson county, Texas. Defendant's reputation for peace and quietude was good.

Mr. Northcutt testified that he lived in Van Zandt county in 1878. Witness and Stephen Tull went west in a wagon, prospecting, in the winter of 1878. They went out through Comanche county, and returned through Palo Pinto county. On the Wednesday before Christmas, 1878, which was December 18, witness and Tull were camped on Gonzales creek in Palo Pinto county, at the crossing of the Palo Pinto and Breckinridge road. Defendant came to that camp about two hours before sundown, but did not pass the night. Witness had known defendant in Van Zandt county.

Cross-examined, the witness stated that the defendant rode a light bay flea-bitten horse into camp. He remained but thirty minutes, and told witness and Tull that he was living with a Mr. Hays. Witness and Tull passed through Comanche and McCulloch counties *en route* to Palo Pinto county, but had no recollection of going through Brown county, nor could he remember the names of the several towns they passed through. Defendant was traveling from west to east when he came to the camp. Witness and Tull reached

home on Christmas eve, and witness located the time of the meeting with defendant, by the fact that they were six days getting home from their camp on Gonzales creek.

William Maxwell testified, for the defense, that he had lived in Eastland county, near the Stephens county line, about five years, having removed to that place from near Wayland in Stephens county. Gonzales creek was near Wayland. Witness knew the defendant in 1878, when the latter lived in Stephens county and worked as a farm and stock hand. Witness did not know the deceased, but on December 21, 1878, a man named Booker told him that a man named Hamilton was killed in Erath county, on the 18th, by a man named Morg. McIntosh. Witness saw the defendant about two hours before sundown, on the evening of December 18, 1878, going from Williams's house to Hays's. He saw him returning over the same route on the next morning, with Ray and Amison. Defendant on both occasions rode a small bay flea-bitten horse, which he got from Mr. Meadows. Defendant had no other horse. Witness had worked with him and was familiar with his possessions. He owned no saddle, no blue overcoat and no brown one eyed-horse, in 1878. Defendant left that neighborhood late in January, 1879, and returned within about six months and remained a week, circulating publicly. He was back there again in 1879.

Cross-examined, the witness said that he did not remember that he rode with the defendant when he saw him on the evening of December 18, 1878. He saw him on the Stephenville and Breckinridge road, going southeast. Defendant left that road, and went west. Gonzales creek flows northeast. From the town of Breckinridge to the point where the Breckinridge and Palo Pinto road crosses Gonzales creek, the distance is seven miles. It is forty miles over a rough road from Breckinridge to Palo Pinto, and it is seventy miles from Breckinridge to Stephenville. The crossing of Gonzales creek spoken of was seven miles from where witness met the defendant in Stephens county, on the evening of December 18, 1878. Witness did not see the defendant three days before the 18th, but saw him every few days along about the time of the killing. Witness heard on the 21st day of December of the killing, and remembered then that he saw the defendant on the 18th and 19th. The similarity of the names Morg. McIntosh and Morg. McInturf impressed his mind.

J. H. Hays was the next witness for the defense. He testified that in 1878 he lived on Gonzales creek, eight miles south of Breckinridge, in Stephens county. He first knew the defendant in Denton

county. Defendant came to witness's house in Stephens county in 1878. Witness heard of the killing of Hamilton a day or two after it occurred. An old man reported it in the neighborhood as having occurred on the 18th day of December. Defendant came to witness's house about an hour before sundown on the evening of the 18th, and stayed all night, sleeping in a bed with Mr. Amison. Witness hauled three bushels of corn for him next day from Stone's place. Defendant then had a small, bay, flea-bitten horse. Witness had never seen him with a one-eyed brown pony or a blue overcoat. Defendant left the neighborhood sometime after December 18, 1878. Maxwell lived about a mile from witness, Amison about a mile, and the witness Smith about a mile and a half.

Cross-examined, the witness testified that he and defendant exchanged work in 1878. Defendant was then improving his place. He was, or had been, working for and staying with Hightower when he came to witness's house on December 18th. Witness did not see defendant on the 16th or 17th days of December, 1878, but saw him on the 18th, and every day or two thereafter for about a month, when he sold his place and went back to his relations. Witness saw defendant at Amison's house during the week preceding the 18th. Defendant had visited the neighborhood several times since he left it and after the 18th day of December, 1878. Witness lived about two miles from the point where the Breckinridge and Stephenville road crosses Gonzales creek. Witness was at home when defendant arrived on the evening of December 18, 1878. Amison came some little time later.

Mr. Amison testified, for the defense, that he first knew the defendant in Stephens county. On or about December 22, 1878, witness heard old man Smith tell a crowd at a neighborhood store that a man named Hamilton was killed in Erath county on the 18th day of that month. Witness was at Hays's house on the night of December 18, 1878. Defendant came to Hays's the same night, after the witness arrived. Witness left Hays's about noon on the next day. He did not know when the defendant left. He next saw defendant at a party at Williams's house on the following Christmas. The defendant owned a bay pony at that time, but no other horse. He owned no blue overcoat. Mr. B. J. Smith told witness, on the Sunday following December 18, 1878, that Morg. McIntosh killed a man in Erath county on the 18th. The similarity of the somewhat peculiar names caused witness to count back, and he remembered then, as now, that he slept with the defendant at Hays's on the night of the 18th.

B. J. Smith testified, for the defense, that in December, 1878, he lived in Stephens county, on a prong of Gonzales creek, about one mile from the main branch, and about eight miles south of Breckinridge. His house was about two and half miles from the houses of the witnesses Hays and Amison. Witness had known the defendant about fifteen years; knew him first in Denton, then in Rockwall, and then in Stephens county. Witness heard of the killing of Hamilton in the town of Wayland. He heard that Hamilton was killed by a man named McIntosh on December 18, 1878. A man named Booker, a mill-repairer, told the news in Wayland on December 21, 1878. Witness was at Hays's house with the defendant on December 19, 1878, and went with him to Wayland on that day. He looked fresh, and his horse betrayed no signs of hard riding. Witness at that time was constable of his beat, and asked the sheriff of Stephens county if he had a writ or writs for the arrest of McInturf. Defendant left Stephens county shortly after the killing of Hamilton, and witness afterwards, in 1879, saw him in Van Zandt county. Defendant worked at grubbing for Hightower in November and December, 1878. He then owned no one-eyed pony or blue overcoat that the witness had ever seen. He rode a bay flea-bitten pony on December 19, 1879. He owned no bridle or saddle, and used only borrowed ones.

Cross-examined, witness said that when he heard of the killing of Hamilton by McIntosh, the possibility of McInturf being meant suggested itself to his mind, and he inquired about defendant's whereabouts on the night of the killing. Witness did not see defendant on the 17th or 18th days of December, 1878. Witness said nothing to defendant about the killing of Hamilton by McIntosh. He had no reason, save the similarity of the names, to suspect the defendant. Witness made the inquiry as to defendant's whereabouts on the night of the killing, at Wayland, on the 21st, and before he counted back and recalled his ride with him on the 19th. Defendant was present at that time. He did not say by whom he could establish his innocence. He merely said that he did not kill Hamilton. Witness was not a special friend to the defendant.

Mr. James testified, for the defense, that he had lived in Van Zandt county, Texas, over twenty years, and had known the defendant for fifteen years. Defendant was arrested, a little more than a year before this trial, at Wills Point, for the murder of the deceased. For three years prior to his arrest the defendant had been about Wills Point, dealing in cattle. He was in the town of Wills Point every month or two, was generally known to be in the neighbor-

hood, and was not "on the dodge." The defendant's reputation for peace and quiet, in Van Zandt county, was good.

George Anderson, for the defense, testified that he lived in Van Zandt county, and had known the defendant for fifteen years. Defendant's reputation was that of a quiet, peaceable, law-abiding citizen. Witness heard of defendant's removal to Stephens county, and knew that he returned to Van Zandt in 1879, and engaged in the stock trade. Witness frequently saw him in Terrell and Wills Point, and knew that he was not "on the dodge."

Tom Murf testified, for the defense, that he first knew the defendant in Kansas in 1869 or 1870, and afterwards in Van Zandt county, Texas. Defendant moved west some time in the 70's and returned to Van Zandt county in 1879 or 1880. His reputation for peace and quiet had always been good, so far as the witness knew.

Press Abbott, for the defense, testified that he lived in Bosque county in 1879. James D. Hamilton was at witness's house during that year, and told witness that Buck Payne, and another man, whose name witness did not remember, killed his father. He said that he saw his father killed; that Payne was in the penitentiary, and that he hoped the other man was in hell.

John Trout testified, for the defense, that he went to Hamilton's house about an hour and a half after dark. He did not think that the moon was shining. He could not see the brush, but could not say that it was dark. A norther blew up before day and some snow and sleet fell.

The motion for new trial raised the questions discussed in the opinion.

*Lee Young* filed an able brief and argument for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE. This is an appeal from a judgment convicting appellant for the murder of one R. R. Hamilton, alleged to have been committed on the 18th day of December, A. D. 1878. By verdict and judgment his punishment is fixed at life imprisonment in the penitentiary.

In his motion in arrest of judgment appellant raised the issues that the penalty assessed by the verdict was not authorized by the law in force 18th December, 1878, when the offense is alleged to have been committed; that the law in force at that time, affixing death alone as a punishment, was the only law by which he could

be tried and punished, and that to apply the alternative punishment of "confinement in the penitentiary for life," which was only incorporated into the Penal Code at its revision and adopted July 24, 1879, or more than six months after the crime was committed, would be to violate the inhibitions contained both in the Federal and State Constitutions against the operation of *ex post facto* laws, and also the further prohibition contained in our State Constitution against *retroactive* laws. (Const., art. 1, sec. 16.)

Again, it is strenuously insisted that, at the time of the commission of this crime (18th December, 1878), and prior to the adoption of the Revised Penal Code, there was no law providing a penalty for murder in the first degree. This last proposition, which we will first notice, has its origin in this condition of the history of the law of murder, or rather its punishment, in Texas.

By the act of February 12, 1858, original Penal Code, article 612*a*, the punishment was fixed at death or confinement in the penitentiary for life. By Oldham & White's Digest, adopted in 1859, the punishment for murder of the first degree was fixed absolutely and without alternative at death. (O. & W. Dig., Penal Code, art. 612*a*.) By the Constitution of 1869 juries in capital cases were empowered to substitute imprisonment to hard labor for life in lieu of the death penalty. When our present Constitution was adopted, it contained no provision whatsoever with regard to the punishment for murder, but was wholly silent upon the subject; and the matter was not again the subject of legislation until the Revised Codes were adopted, the 24th of July, 1879, when the punishment for murder of the first degree was again fixed alternatively at death or confinement in the penitentiary for life. (Penal Code, art. 609.)

The position assumed is that the law of the punishment from the adoption of the Constitution of 1869 was the law of the crime from that time on until the adoption of the present Constitution, March 24, 1876; that the present was intended to and did supersede entirely the Constitution of 1869, leaving none of its provisions of any further force and effect, except such as were expressly continued in operation; that, nothing being said in the last Constitution about murder or its punishment,— in other words its being entirely silent upon the matter,— it was an abrogation instead of a perpetuation of the clause as found in the Constitution of 1869; and, having repealed and abrogated that clause, which was the only law in force at the time with regard to the punishment of murder, the State, from the date of the adoption of the Constitution of 1876, had no law punishing murder, and all the laws theretofore punishing it were repealed by the

adoption of said Constitution; that, from the adoption of the Constitution of 1876 to the Revised Code, 24th of July, 1879, there was no law in existence denouncing a punishment against murder of the first degree.

The question is not a new one in this State; the same positions have been taken and insisted upon more than once, and in our opinion have been decided more than once. As held in these decisions the rule is that by the statute law as found in Oldham & White's Digest, adopted in 1858, the punishment for murder of the first degree was fixed by law at death. The Constitution of 1869 did not supply or intend to supply a new law nor to repeal the statutory one; it simply provided for a commutation, or a different penalty by way of commutation.

The language used shows this, and can admit of no other construction. It is in these words: "That in all cases where by law it may be provided that capital punishment may be inflicted, the jury shall have the right, in their discretion, to substitute imprisonment for life." (Const. 1869, art. V, sec. 8.) Now this clause, instead of repealing or abrogating former laws, recognizes their force and existence and binding effect as they are, but gives to the jury the authority to ameliorate or commute their punishment in capital cases. When that Constitution was done away with by one entirely supplanting it and silent upon this matter of commutation, what was the result? That all laws inflicting capital punishment were repealed? By no means. But simply that the commutation, or alternative penalty, which it had vested in the discretion of the jury, was repealed or taken away,— leaving the law inflicting capital punishment just as it was before that commutation clause or alternative punishment found expression in the Constitution. The law of punishment for murder in the first degree as found in Oldham & White's Digest, and which had never been repealed, still continued to be the law until the present Penal Code was adopted in 1879, when the alternative punishment was again made the law by statutory enactment as it had been in the original Code of 1858. (See *Murray* v. *The State*, 1 Texas Ct. App., 417; *Hunt* v. *The State*, 7 Texas Ct. App., 212; *Cox et als.* v. *The State*, 8 Texas Ct. App., 255; *Doran* v. *The State*, 7 Texas Ct. App., 385.)

When this murder, then, was committed, the 18th of December, 1878, the only punishment known to our law was that of death. Before the trial, however, the alternative punishment became part of the law. Was it *retroactive* or *ex post facto* as applied to this case, the facts of which occurred before its adoption? What are

*ex post facto laws?* This question is answered negatively in the language of Judge Chase in *Calder* v. *Bull,* quoted by this court in *Murray* v. *The State,* 1 Texas Ct. App., 417. He says: "But I do not consider any law *ex post facto* within the prohibition that modifies the rigors of the criminal law, but only those that create or aggravate the crime, or increase the punishment, or change the rules of evidence for the purpose of conviction." (3 Dall., 309; *Holt* v. *The State,* 2 Texas, 363; *Dawson* v. *The State,* 6 Texas, 347.) In no sense can we conceive how a mere remedy which ameliorates punishment and inures solely to the benefit of the party to be punished can be considered as coming within the prohibition of retroactive or *ex post facto* laws; and this is particularly obvious to our minds where the party himself has it in his power to decline the ameliorated punishment and elect to be punished under the law as it was when the crime was committed. This, Noftsinger did, and perhaps he went to the gallows on account of his temerity. (*Noftsinger* v. *The State,* 7 Texas Ct. App., 301.)

It is provided by statute that, " when the penalty for an offense is prescribed by one law and altered by a subsequent law, the penalty of such second law shall not be inflicted for a breach of the law committed before the second shall have taken effect. In every such case the offender shall be tried under the law in force when the offense was committed, and, if convicted, punished under that law; except that, when by the provisions of the second law the punishment of the offense is ameliorated, the defendant shall be punished under such last enactment, unless he elect to receive the penalty prescribed by the law in force when the offense was committed." (Penal Code, art. 15.) The defendant never elects except in case of amelioration. When the punishment for an offense is ameliorated by statute after its commission, the defendant upon conviction must be punished according to the latter enactment unless he elect to receive the penalty affixed by the former law, and such election must be made before verdict. (*Maul* v. *The State,* 25 Texas, 166; *Veal* v. *The State,* 8 Texas Ct. App., 474; *Perez* v. *The State,* 8 Texas Ct. App., 610.) If appellant desired to be punished under the old law he should have made his election, and the court doubtless would have accorded him the right. Having failed to do so, the duty of the court to give him the benefit of the ameliorated punishment was imperative.

Objection is made to the sufficiency of the verdict as copied into the judgment. As set out in the judgment, the verdict does not assess or fix the term or time of confinement in the penitentiary;

that is, it finds him guilty of murder of the first degree, assesses his punishment at confinement in the penitentiary, but does not state that the confinement is to be for life. If this error was not shown by the record itself to be a mere clerical one, we should hold it to be fatal. But the record elsewhere sets forth the verdict as it was rendered, and it is in statutory form and assesses the punishment in the penitentiary at imprisonment for life. Such mistakes are, however, inexcusable upon the part of a clerk in cases of such gravity and importance. As presented by the record, the objection to the verdict fails of merit.

The defendant's first bill of exception was saved to the refusal of the court to require the State's counsel (the district attorney and counsel employed to assist in the prosecution) to furnish defendant with the name or names of parties who had employed the assistant counsel, so as to enable defendant intelligently to exercise his right of challenge to the jurors by ascertaining whether or not said jurors were related in the third degree to said private prosecutors. In his explanation to the bill the learned judge states that in testing the jurors he allowed full latitude and they were freely examined touching their qualifications upon this point, and that none of them were found to have been aiding the State by contributing to the prosecution. It is a ground of challenge under the statute that the proposed juror is related within the third degree to the private prosecutor, if there be one. (Code Crim. Proc., art. 636, subdivis. 10.) This precise question came up in Heacock's case, in which it was shown that there was a list of persons who had subscribed a fund to employ counsel to prosecute. It was held that such subscribers were not private prosecutors within the meaning of the statute, and that the refusal of the court to compel a disclosure of the names of the parties was not error where a full examination of the particular jurors had been made with regard to their connection with the fund subscribed. (*Heacock* v. *The State*, 13 Texas Ct. App., 97.) That case is decisive of the point, and the court did not err in its ruling.

Defendant's second and third bills of exception relate to the ruling of the court in excluding evidence with regard to murders committed by the deceased R. R. Hamilton, during the war, between the years 1862 and 1864. It was not proposed to show or offer made to prove that any one connected with or related to or who were likely to avenge the murdered parties were in proximity to the place of homicide at or about the time it was committed, or had any opportunity to kill the deceased. The rule now established is that

"investigation with reference to other parties than the accused should not be permitted in cases either positive or circumstantial unless the inculpatory facts are such as are proximately connected with the transaction. In other words, to show remote acts or threats would not be admissible unless there were other facts also in proof proximately and pertinently connecting such third party with the homicide at the time of its commission." (*Dubose* v. *The State*, 10 Texas Ct. App., 230; *Means* v. *The State*, 10 Texas Ct. App., 16; *Aiken* v. *The State*, 10 Texas Ct. App., 610; *Hart* v. *The State*, 15 Texas Ct. App., 202; 72 Ala., 522.) There was no error in the ruling of the court in this matter.

Matter presented in the fourth bill of exception does not show error. Just after deceased Hamilton was shot he staggered into the house, asked his wife to examine his wound, and when she told him the ball had passed entirely through his body, he remarked: " I am a dead man, but, thank God, I die innocent;" and, in reply to the question by his wife, "Who did it, Bob?" he replied "Morg. McInturf (the defendant) and them." This evidence was held by the court below to be *res gestœ*. We are of a like opinion. (*Booth* v. *The State*, 4 Texas Ct. App., 203; *Bejerano* v. *The State*, 6 Texas Ct. App., 282; *Foster* v. *The State*, 8 Texas Ct. App., 248; *Veal* v. *The State*, id., 475; *Stagner* v. *The State*, 9 Texas Ct. App., 441; *Warren* v. *The State*, id., 619; *Pierson* v. *The State*, 18 Texas Ct. App., 525.)

In his fifth bill of exception appellant complains of remarks made by counsel employed to assist in the prosecution in his address to the jury. It had been made to appear in the evidence that the deceased was a witness for the State in a prosecution pending against defendant and perhaps another party. Counsel in his address to the jury, in developing a supposed motive for the killing on the part of defendant, spoke of his having killed the witness against him in order to get rid of his testimony, and made some additional remarks to the effect, as understood by opposing counsel, that they, the jury, were asked to turn loose a man who might kill some other honest man who had dared to stand up and testify in this case against him. When counsel objected to the argument as "unfair and improper," the court called the speaker's attention to it, and, when informed of the objection, counsel immediately denied that he had made such an argument, and added to his explanation of what he had and did say to the jury that " he certainly did not believe that the defendant would injure any witness in this case if acquitted, for he thought this prosecution had given the defendant such a scare as would.

deter him from attempting to do any such thing." It appears that so soon as objection was made counsel disclaimed the statement or argument imputed to him, and the court states in his addenda to the bill that the disclaimer and explanation of counsel seemed to him well calculated to dispel any unfavorable impression, if any existed." Under the circumstances stated in the explanation of the court to the bill, we cannot see that it presents matter for an animadversion, much less reversible error. It was clearly within the bounds for counsel to seek a motive for facts legitimately in evidence in the case, and to urge it upon the consideration of the jury.

On the motion for new trial defendant was permitted to introduce some testimony which tended to contradict the testimony of the State's principal witnesses in some material facts. Why this evidence was not introduced on the trial we are not apprised. The sixth bill of exceptions complains that the court overruled the motion for a new trial after hearing this evidence. As to the credibility of the witnesses, the lower court was in a better position by far to judge than are we, and even from our standpoint the evidence, if true, would not necessarily establish the falsity of the statements of the State's witnesses with regard to the light or darkness of the night at the time of the homicide, because the one set of witnesses spoke of the appearance of the night in the earlier part and the other of the latter part of the night,— which, they said, was dark, drizzling and sleeting, and that early the next morning a snow fell. We can perceive no contradiction nor conflict in the testimony. Each of the witnesses may have testified with exact truthfulness; it is by no means impossible, and altogether probable, that they have done so.

The matter presented in the last or seventh bill is substantially the same as already discussed in the fifth bill, *supra*, and requires no additional notice at our hands.

It is most strenuously insisted that the evidence is not sufficient to support the verdict and judgment. We cannot agree with the view of able counsel for appellant on this proposition. In our opinion, the case against appellant is most clearly, fully and satisfactorily established. His identity with the assassin in this most heinous murder is amply made out if the State's witnesses are to be believed; and their statements as to the important details of the transaction bear all the appearances of truth. Whatever may have been defendant's motive, whether to get rid of a witness whose testimony he feared, or whether he was the hired assassin of other parties, makes no difference; that he was the assassin who murdered, in the presence of his family, the man whose hospitality he had as a

stranger enjoyed on several occasions is, we think, most clearly established. No reversible error has been made to appear on his appeal; he seems, so far as disclosed in the record, to have had a fair and impartial trial. And it only remains for us to affirm the judgment, which is accordingly done.

*Affirmed.*

[Opinion delivered February 17, 1886.]